**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- :
RYAN O'DELL,                                             :
                                                         :
              Plaintiff,                                 :   Case No. 1:22-cv-5352
                                                         :
v.                                                       :
                                                         :   **COMPLAINT FOR VIOLATIONS OF**
TURNING POINT THERAPEUTICS, INC.,                        :   **SECTIONS 14(e), 14(d) AND 20(a) OF**
MARK J. ALLES, BARBARA W. BODEM,                         :   **THE SECURITIES EXCHANGE ACT**
ATHENA COUNTOURIOTIS, M.D.,                              :   **OF 1934**
CAROL GALLAGHER, PHARM.D,                                :
SIMEON J. GEORGE, M.D., M.B.A.,                          :   **JURY TRIAL DEMANDED**
PATRICK MACHADO, J.D., and GARRY                         :
NICHOLSON,                                               :
                                                         :
              Defendants.                                :
--------------------------------------------------------- :

Ryan O'Dell ("Plaintiff"), by and through his attorneys, alleges the following upon

information and belief, including investigation of counsel and review of publicly-available

information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal

knowledge:

1.      This is an action brought by Plaintiff against Turning Point Therapeutics, Inc.

("Turning Point or the "Company") and the members Turning Point board of directors (the

"Board" or the "Individual Defendants" and collectively with the Company, the "Defendants") for

their violations of Sections 14(e), 14(d), and 20(a) of the Securities Exchange Act of 1934 (the

"Exchange Act"), in connection with the proposed acquisition of Turning Point by affiliates of

Bristol-Myers Squibb Company ("Bristol-Myers").

2.      Defendants have violated the above-referenced Sections of the Exchange Act by

causing a materially incomplete and misleading Solicitation Statement on Schedule 14D-9 (the

"Solicitation Statement") to be filed on June 17, 2022 with the United States Securities and

Exchange Commission ("SEC") and disseminated to Company stockholders. The Solicitation Statement recommends that Company stockholders tender their shares in support of a proposed transaction whereby Rhumba Merger Sub Inc., a wholly owned subsidiary of Bristol Myers, will merge with and into Turning Point, with Turning Point continuing as the surviving corporation and as a wholly owned subsidiary of Bristol-Myers (the "Proposed Transaction"). Pursuant to the terms of the definitive agreement and plan of merger the companies entered into, dated June 2, 2022 (the "Merger Agreement"), each Turning Point common share issued and outstanding will be converted into the right to receive $76.00 per share owned (the "Merger Consideration"). In accordance with the Merger Agreement, Merger Sub commenced a tender offer to acquire all of Turning Point's outstanding common stock and will expire on July 18, 2022 (the "Tender Offer").

3.      Defendants have now asked Turning Point's stockholders to support the Proposed Transaction based upon the materially incomplete and misleading representations and information contained in the Solicitation Statement, in violation of Sections 14(e), 14(d), and 20(a) of the Exchange Act. Specifically, the Solicitation Statement contains materially incomplete and misleading information concerning, among other things, (i) Turning Point's financial projections relied upon by the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs"); and (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by Goldman Sachs. The failure to adequately disclose such material information constitutes a violation of Sections 14(e), 14(d), and 20(a) of the Exchange Act as Turning Point stockholders need such information in order to tender their shares in support of the Proposed Transaction.

4.      It is imperative that the material information that has been omitted from the Solicitation Statement is disclosed to the Company's stockholders prior to the expiration of the tender offer.

5.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Turning Point's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(e), 14(d), and 20(a) of the Exchange Act and SEC Rule 14a-9.

7.      Personal jurisdiction exists over each Defendant either because each is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Plaintiff resides in this District.

## PARTIES

9.      Plaintiff is, and has been at all relevant times, the owner of Turning Point common stock and has held such stock since prior to the wrongs complained of herein.

10.      Individual Defendant Mark J. Alles has served as a member of the Board since May 2021 and is the Chair of the Board.

11.     Individual Defendant Barbara W. Bodem has served as a member of the Board since March 2021.

12.     Individual Defendant Athena Countouriotis, M.D. has served as a member of the Board since September 2018 and is the Company's President and Chief Executive Officer.

13.     Individual Defendant Carol Gallagher, Pharm.D. has served as a member of the Board since July 2019.

14.     Individual Defendant Simeon J. George, M.D., M.B.A. has been a member of the Board since May 2017.

15.     Individual Defendant Patrick Machado, J.D. served as member of the Board since May 2019.

16.     Individual Defendant Garry Nicholson served as member of the Board since January 2020.

17.     Defendant Turning Point is incorporated in Delaware and maintains its principal offices at 10628 Science Center Drive, Suite 200, San Diego, California 92121.  The Company's common stock trades on the NASDAQ Stock Exchange under the symbol "TPTX."

18.     The defendants identified in paragraphs 10-16 are collectively referred to as the "Individual Defendants" or the "Board."

19.     The defendants identified in paragraphs 10-17 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

A.     **The Proposed Transaction**

20.     Turning Point, a clinical-stage precision oncology biopharmaceutical company, engages in designing and developing therapies that target genetic drivers of cancer. It develops a pipeline of tyrosine kinase inhibitors (TKIs) that targets genetic drivers of cancer in TKI-naïve and

TKI-pretreated patients. The Company's lead drug candidate repotrectinib is being evaluated in an ongoing Phase 1/2 trial called TRIDENT-1 for the treatment of patients with ROS1+ advanced non-small-cell lung cancer (NSCLC) and patients with ROS1+ and NTRK+ advanced solid tumors. It also develops TPX-0022, a MET/SRC/CSF1R inhibitor, which is in Phase 1 SHIELD-1 clinical trial for patients with advanced solid tumors harboring genetic alterations in MET; TPX-0046, a RET inhibitor that is in 1/2 SWORD-1 clinical trial for patients with advanced solid tumors harboring RET genetic alterations; and TPX-0131, an ALK inhibitor, which is in Phase 1/2 FORGE-1 study for patient with advanced or metastatic TKI-pretreated ALK-positive NSCLC. Turning Point was founded in 2013 and is headquartered in San Diego, California.

21.    On June 3, 2022, Bristol-Myers and the Company announced the Proposed Transaction:

> (NEW YORK & SAN DIEGO, June 3, 2022) – Bristol Myers Squibb (NYSE:BMY) and Turning Point Therapeutics, Inc. (NASDAQ:TPTX) today announced a definitive merger agreement under which Bristol Myers Squibb will acquire Turning Point Therapeutics for $76.00 per share. The transaction was unanimously approved by both the Bristol Myers Squibb and Turning Point Therapeutics Boards of Directors and is anticipated to close during the third quarter of 2022.
>
> Turning Point Therapeutics is a clinical-stage precision oncology company with a pipeline of investigational medicines designed to target the most common mutations associated with oncogenesis. Turning Point Therapeutics' lead asset, repotrectinib, is a next-generation, potential best-in-class tyrosine kinase inhibitor (TKI) targeting the ROS1 and NTRK oncogenic drivers of non-small cell lung cancer (NSCLC) and other advanced solid tumors. Repotrectinib has been granted three Breakthrough Therapy Designations from the U.S. Food and Drug Administration. In the Phase 1/2 TRIDENT-1 clinical trial, longer duration of response has been observed in the landmark analysis with repotrectinib than with existing ROS1 agents in first-line NSCLC.
>
> Bristol Myers Squibb expects repotrectinib to be approved in the U.S. in the second half of 2023 and become a new standard of care

for patients with ROS1-positive NSCLC in the first-line setting. The company also plans to continue to explore the potential of Turning Point Therapeutics' promising pipeline of novel compounds.

"The acquisition of Turning Point Therapeutics further broadens our leading oncology franchise by adding a best-in-class, late-stage precision oncology asset," said Giovanni Caforio, M.D., Board Chair and Chief Executive Officer, Bristol Myers Squibb. "With this transaction, we are continuing our strong track record of strategic business development to further enhance our growth profile."

"Today's news builds upon our long legacy of pioneering next-generation medicines for patients with cancer," said Samit Hirawat, M.D., Chief Medical Officer, Global Drug Development, Bristol Myers Squibb. "With repotrectinib, we have the opportunity to change the standard of care and address a significant unmet medical need for ROS1-positive non-small cell lung cancer patients."

"Through this transaction, we will be able to harness the full potential of our precision oncology platform to advance the standard of care for cancer patients. Since our founding, we have leveraged our deep scientific expertise to develop a pipeline of promising precision oncology assets," said Athena Countouriotis, M.D., President and Chief Executive Officer, Turning Point Therapeutics. "With Bristol Myers Squibb's leadership in oncology, strong commercial capabilities and manufacturing footprint, we will be able to further accelerate the pace at which we can bring our novel medicines to benefit people diagnosed with cancer around the world."

**Financial Details and 2022 Financial Guidance**

The transaction supports Bristol Myers Squibb's medium- to long-term growth strategy with accretion to non-GAAP earnings per share (EPS) beginning in 2025. The transaction is expected to be up to $0.08 per share dilutive to non-GAAP EPS in 2022 prior to any impact from an acquired in-process research and development charge based on final accounting treatment. The accounting treatment as a business combination or asset acquisition will be determined upon the expected close of the transaction in the third quarter of 2022.

**Transaction Terms and Financing**

Under the terms of the merger agreement, Bristol Myers Squibb will promptly commence a tender offer to acquire all of the outstanding shares of Turning Point Therapeutics' common stock at a price of $76.00 per share in an all-cash transaction for a total consideration of $4.1 billion in equity value. Turning Point Therapeutics' Board of Directors unanimously recommends that Turning Point Therapeutics shareholders tender their shares in the tender offer.

The transaction is subject to customary closing conditions, including the tender of a majority of the outstanding shares of Turning Point Therapeutics' common stock and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. Following the successful closing of the tender offer, Bristol Myers Squibb will acquire all remaining shares of Turning Point Therapeutics that are not tendered into the tender offer through a second-step merger at the same price of $76.00 per share.

Bristol Myers Squibb expects to finance the acquisition with cash on hand.

<u>Advisors</u>

Gordon Dyal & Co., LLC is serving as the exclusive financial advisor to Bristol Myers Squibb, and Kirkland & Ellis LLP is serving as legal counsel. Goldman Sachs & Co. LLC is serving as the exclusive financial advisor to Turning Point Therapeutics, and Cooley LLP is serving as legal counsel.

\* \* \*

22.     It is therefore imperative that Turning Point's stockholders are provided with the material information that has been omitted from the Solicitation Statement, so that they can meaningfully assess whether or not the Proposed Transaction is in their best interests.

**B.     <u>The Materially Incomplete and Misleading Solicitation Statement</u>**

23.     On June 16, 2022, Turning Point filed the Solicitation Statement with the SEC in connection with the Proposed Transaction.  The Solicitation Statement was furnished to the Company's stockholders and solicits the stockholders to tender their shares in support of the

Proposed Transaction.  The Individual Defendants were obligated to carefully review the Solicitation Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Solicitation Statement misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to tender their shares, in violation of Sections 14(e), 14(d), and 20(a) of the Exchange Act.

24.    The Solicitation Statement fails to provide material information concerning financial projections by Turning Point management and relied upon by Goldman Sachs and Morgan Stanley in their analyses. The Solicitation Statement discloses management-prepared financial projections for the Company which are materially misleading. The Solicitation Statement indicates that in connection with the rendering of its fairness opinion, that the Company prepared certain non-public financial forecasts (the "Company Projections") and provided them to the Board and Goldman Sachs with forming a view about the stand-alone valuation of the Company. Accordingly, the Solicitation Statement should have, but fails to provide, certain information in the projections that Turning Point management provided to the Board and Goldman Sachs. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

25.    For the Company Projections, the Solicitation Statement provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics: Adjusted EBITDA, Adjusted EBIT, Unlevered Free Cash Flow, and Adjusted Funds From Operations, but fails to provide line items used to calculate the metrics and a reconciliation of the non-GAAP metrics to

their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

26.    When a company discloses non-GAAP financial measures in a Solicitation Statement that were relied on by a board of directors to recommend that stockholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

27.    The SEC has noted that:

> companies should be aware that this measure does not have a uniform definition and its title does not describe how it is calculated. Accordingly, a clear description of how this measure is calculated, as well as the necessary reconciliation, should accompany the measure where it is used. Companies should also avoid inappropriate or potentially misleading inferences about its usefulness. For example, "free cash flow" should not be used in a manner that inappropriately implies that the measure represents the residual cash flow available for discretionary expenditures, since many companies have mandatory debt service requirements or other non-discretionary expenditures that are not deducted from the measure.[1]

Thus, to cure the Solicitation Statement and the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information in the Solicitation Statement, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures to make the non-GAAP metrics included in the Solicitation Statement not misleading.

---

[1] U.S. Securities and Exchange Commission, Non-GAAP Financial Measures, last updated April 4, 2018, available at: https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm

*Omissions and/or Material Misrepresentations Concerning Turning Point Financial Projections*

28.     The Solicitation Statement fails to provide material information concerning financial projections by Turning Point management and relied upon by Goldman Sachs in its analysis. The Solicitation Statement discloses management-prepared financial projections for the Company which are materially misleading. The Solicitation Statement indicates that in connection with the rendering of its fairness opinion, that the Company prepared certain non-public financial forecasts (the "Company Projections") and provided them to the Board and Goldman Sachs with forming a view about the stand-alone valuation of the Company. Accordingly, the Solicitation Statement should have, but fails to provide, certain information in the projections that Turning Point management provided to the Board and Goldman Sachs. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

29.     For the Company Projections, the Solicitation Statement provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics: Adjusted Revenue, NOPAT and Unlevered Free Cash Flow, but fails to provide line items used to calculate these metrics and/or a reconciliation of these non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

30.     When a company discloses non-GAAP financial measures in a Solicitation Statement that were relied on by a board of directors to recommend that stockholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP

measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

31.     The SEC has noted that:

> companies should be aware that this measure does not have a uniform definition and its title does not describe how it is calculated. Accordingly, a clear description of how this measure is calculated, as well as the necessary reconciliation, should accompany the measure where it is used. Companies should also avoid inappropriate or potentially misleading inferences about its usefulness. For example, "free cash flow" should not be used in a manner that inappropriately implies that the measure represents the residual cash flow available for discretionary expenditures, since many companies have mandatory debt service requirements or other non-discretionary expenditures that are not deducted from the measure.[2]

32.     Thus, to cure the Solicitation Statement and the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information in the Solicitation Statement, Defendants must provide a reconciliation table of the non-GAAP measure to the most comparable GAAP measure to make the non-GAAP metrics included in the Solicitation Statement not misleading.

*Omissions and/or Material Misrepresentations Concerning Goldman Sachs's Financial Analysis*

33.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*, the Solicitation Statement fails to disclose: (i) the line items used to calculate the Company's Projections and NOL Forecasts; (ii) the inputs and assumptions underlying the discount rates ranging from 10.5% to 12.5%; (iii) the Company's weighted average cost of capital; (iv) inputs

---

[2] U.S. Securities and Exchange Commission, Non-GAAP Financial Measures, last updated April 4, 2018, available at: https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm

and assumptions underlying the range of perpetuity growth rates of 1.0% to 3.0%; (v) the range of illustrative terminal values for the Company; (vi) the number of fully diluted outstanding shares of Turning Point as of June 1, 2022; and (vii) the net cash balance for Turning Point as of March 31, 2022 pro forma for in-license on TPX-4589.

34.    In sum, the omission of the above-referenced information renders statements in the Solicitation Statement materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the expiration of the Tender Offer, Plaintiff will be unable to make a fully-informed decision regarding whether to tender their shares, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff Against All Defendants for
Violations of Section 14(e) of the Exchange Act**

35.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

36.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . ." 15 U.S.C. § 78n(e).

37.    Defendants violated Section 14(e) of the Exchange Act by issuing the Solicitation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in conjunction with the Tender Offer. Defendants knew or recklessly disregarded that the Solicitation Statement failed to disclose material facts necessary in

12

order to make the statements made, in light of the circumstances under which they were made, not misleading.

38.     The Solicitation Statement was prepared, reviewed and/or disseminated by Defendants. It misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the Tender Offer, the intrinsic value of the Company, the Company's financial projections, and the financial advisor's valuation analyses and resultant fairness opinion.

39.     In so doing, Defendants made untrue statements of material fact and omitted material information necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act. By virtue of their positions within the Company and/or roles in the process and in the preparation of the Solicitation Statement, Defendants were aware of this information and their obligation to disclose this information in the Solicitation Statement.

40.     The omissions and misleading statements in the Solicitation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal. In addition, a reasonable investor would view the information identified above which has been omitted from the Solicitation Statement as altering the "total mix" of information made available to stockholders.

41.     Defendants knowingly, or with deliberate recklessness, omitted the material information identified above from the Solicitation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Tender Offer, they allowed it to be omitted from the Solicitation Statement, rendering certain portions of the Solicitation Statement materially incomplete and therefore misleading.

42.     The misrepresentations and omissions in the Solicitation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

**COUNT II**
**Violations of Section 14(d)(4) of the Exchange Act and**
**Rule 14d-9 Promulgated Thereunder**
**(Against All Defendants)**

43.     Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

44.     Defendants have caused the Solicitation Statement to be issued with the intention of soliciting stockholder support of the Tender Offer.

45.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

46.     The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which render the Solicitation Statement false and/or misleading.

47.     Defendants knowingly, or with deliberate recklessness, omitted the material information identified above from the Solicitation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Tender Offer, they allowed it to be omitted from the Solicitation Statement, rendering certain portions of the Solicitation Statement materially incomplete and therefore misleading.

48.     The misrepresentations and omissions in the Solicitation Statement are material to Plaintiff and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

## COUNT III

**On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

49.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50.     The Individual Defendants acted as controlling persons of Turning Point within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of Turning Point, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Solicitation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Turning Point, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

51.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Solicitation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Turning Point, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Solicitation Statement at issue contains the unanimous recommendation of the Board to approve the Proposed Transaction. The Individual Defendants were thus directly involved in the making of the Solicitation Statement.

53.     In addition, as the Solicitation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Solicitation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

54.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

55.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(d) and (e), by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

56.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and against the Defendants jointly and severally, as follows:

A.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Solicitation Statement;

A.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

B.      Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 24, 2022                    **MELWANI & CHAN LLP**

/s *Gloria Kui Melwani*
Gloria Kui Melwani (GM5661)
1180 Avenue of the Americas, 8th Floor
New York, New York 10036
Tel: (212) 382-4620
Email:  gloria@melwanichan.com

*Attorneys for Plaintiff*